United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SHERRY RUIZ-STEELE, et al.,

Plaintiffs,

v.

FORD MOTOR COMPANY, et al.,

Defendants.

Case No. 25-cv-03799-RS

**ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I. INTRODUCTION

Plaintiffs purchased a Ford Maverick in 2022, which they claim suffered from various defects that rendered it unfit for ordinary use. In addition to several claims under California's Song-Beverly Consumer Warranty Act, Plaintiffs argue that Ford fraudulently induced their purchase of the vehicle by concealing an "engine defect," and aver they would not have bought the car had they known about the issue. Ford denies that there was any "engine defect" in the first place and accordingly seeks partial summary judgment on the fraud claim. For the reasons below, Ford's motion is granted.

## II. BACKGROUND

Ms. Ruiz-Steele bought the car in July 2022 from a Ford dealership in Petaluma for $47,718.96. She was seeking a reliable and efficient car for Mr. Boek to use to commute to their property, some 75 miles each way. Two days prior to the sale, Hansel Ford performed service related to a voluntary recall—22S47—to address the risk of an under-hood fire from the

accumulation of fuel vapors in "CERTAIN … 2022 MODEL YEAR MAVERICK VEHICLES EQUIPPED WITH A 2.5L HEV/PHEV ENGINE." Opp. at 3. The maintenance involved cutting holes in the engine front undershield to allow better diffusion of vapors and reduce the risk of fires. Dkt. 28-2, Exhibit A to Def. Reply Br. ISO Mot. for Partial Summary Judgment. Plaintiffs maintain, and Ford does not specifically dispute, that no one personally disclosed the fact of, or explained the significance of, the recall repairs to Ms. Ruiz-Steele at the time of purchase.

However, Plaintiffs did not notice or complain of any problems related to under-hood accumulation of fuel vapors or fires. In 2022, they returned to the dealer for various minor issues, including an inoperable radio. Subsequently, they returned for additional service under voluntary recalls: once in December 2023 for service on the powertrain control module, and again in July 2024 for updates to software pertinent to the 22S47 recall regarding the risk of under-hood fires. Nevertheless, they experienced repeated and frustrating issues with the car not starting. On several of these occasions, Mr. Boek says he was left stranded in remote areas with poor cellular signal. In September 2024, Plaintiffs took the Maverick to Hansel Ford after the check-engine light turned on. A technician initially found no problems with the car, but while the Maverick sat in the parking lot, he noticed its battery had lost two percent of its charge within one hour. At that point, the technician replaced the battery for free. After September 2024, Plaintiffs reported no specific issues and sought no further service on the subject vehicle, save for routine maintenance on April 1, 2025. Mr. Boek declared that he essentially stopped driving the car because he found it unreliable, and he was worried that it would again fail to start in a remote location. Dkt. 27, at 6. While this action was pending, Plaintiffs sold the car on April 17, 2025. *Id.*

In December 2024, Plaintiffs filed this lawsuit in state court against Ford and the local dealership who sold them the car, seeking roughly $135,000 in damages for violations of the Song-Beverly Consumer Warranty Act and common law fraud. Dkt. 1-1, at 3-4. After Plaintiffs voluntarily dismissed their claims against the dealership, Ford removed the case to federal court based on diversity jurisdiction. Now, Ford moves for partial summary judgment as to the fraud claim.

United States District Court
Northern District of California

## III. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." F.R.C.P. 56(a). The moving party "bears the initial responsibility of informing the district court of the basis for its motion[] and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to "offer evidence of such a caliber that a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented." *United States v. Wilson*, 881 F.2d 596, 601 (9th Cir. 1989) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). The court "must view the evidence, including all reasonable inferences, in favor of the non-moving party." *Reed v. Lieurance*, 863 F.3d 1196, 1204 (9th Cir. 2017). Nonetheless, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## IV. DISCUSSION

Defendant Ford argues that Plaintiffs have not shown any genuine dispute of material fact as to their fraud claim. Ford argues that because there was no engine defect to disclose, there could not have been any misrepresentation, cutting off this claim at the first step of the analysis. Plaintiffs argue there was a defect, based on either (a) a series of voluntary recalls related to under-hood engine fires or (b) their experience with severe battery malfunctions. However, there is no evidentiary basis to conclude—nor do Plaintiffs directly attempt to argue—that these two issues are related. Looking at each potential defect separately, Plaintiffs cannot show all five elements required by California law to establish fraud on either theory, as discussed below. A patchwork argument mixing the two defect theories is not viable. Therefore, Ford is entitled to partial summary judgment on Plaintiffs' fraud claim.

Before reaching the merits, Plaintiffs argue that Defendant's motion is premature because discovery does not close until October 31, 2026. It is true that relief in the form of delayed adjudication could be proper if Plaintiffs showed "by affidavit or declaration that, for specified

reasons, it cannot present facts essential to justify its opposition." F.R.C.P. 56(d). However, the key dispute in this motion is whether there was an engine defect and if so, whether Ford knew about it and concealed it from Ruiz-Steele. Demonstrating this fact would likely require discovering some information internal to Ford, to show the company's knowledge, but Plaintiffs make no claim that they are waiting on such evidence. Rather, they object only to the fact that Defendant declined to take the noticed depositions of the Plaintiffs, Ms. Ruiz-Steele and Mr. Boek. There is no basis to assume that either could testify, based on their personal knowledge as lay witnesses, that Ford knew about and concealed an engine defect; even if they did have such knowledge, it would be Plaintiffs' task to present that evidence in the first instance. More fundamentally, there is no basis for Plaintiffs to argue that the lack of these depositions means they "cannot present facts essential to justify [their] opposition," because those facts are squarely within their control. F.R.C.P. 56(d). As such, Ford's motion is not premature, and adjudicating it now is proper.

A. <u>Plaintiffs' Fraud Claims</u>

Under California law, a plaintiff alleging fraud must prove (1) "misrepresentation (false representation, concealment, or nondisclosure)," (2) knowledge of falsity, or "scienter," on the part of the defendant, (3) intent to defraud, or to "induce reliance," (4) justifiable reliance by the plaintiff on the misrepresentation, and (5) resulting damages. *Small v. Fritz Cos., Inc.*, 65 P.3d 1255, 1258 (Cal. 2003). Here, Ford is right that Plaintiffs fail to present a genuine dispute of material fact sufficient to survive summary judgment, at least as to the fraud claim.

Plaintiffs' complaint on this claim focused on an "engine defect" that could cause loss of power to the engine while driving—endangering drivers and those around them—as well as premature wear on the engine and related components, requiring unduly expensive repairs. They alleged that Ford knew about this defect but concealed it at the time of purchase, but for which fact Ms. Ruiz-Steele would not have purchased the vehicle. With the benefit of discovery to substantiate their allegations, Plaintiffs have focused their arguments primarily on issues related to a voluntary recall, 22S47, which covered certain 2022 model year Ford vehicles and sought to

address the risk of an under-hood fire from excess accumulation of fuel vapors. They also highlight the specific issues they faced with the subject vehicle, which centered on difficulty starting the car during 2024 and at least two occasions where a check-engine light prompted them to bring the car in for service.

*1. The Recall Issues*

Plaintiffs' primary theory of the case centers on the 22S47 recall, which was a voluntary recall campaign by Ford seeking to reduce the potential risk of engine fires in certain vehicles. As Plaintiffs would have it, "Ford performed a fire-risk recall on this engine before the sale and another two years later. That is evidence of an engine defect." Plaintiffs' Opp. Br. at 10. They argue that this creates at least a triable issue of fact as to whether the car suffered from an engine defect, regardless of whether the subject vehicle suffered from mechanical problems attributable to the problems the recall was attempting to fix. In Plaintiffs' telling, the battery issues addressed in September 2024 are plausibly related to that engine defect, or, at minimum, it is not their burden to "pinpoint the exact mechanical cause" of a problem to establish that there is a defect. *Id.* (quoting *Schreidel v. American Honda Motor Co.*, 34 Cal. App. 4th 1242, 1253).[1]

There are two problems with this theory of a "defect." First, while a plaintiff need not pinpoint mechanical causes of a problem to pursue a Song-Beverly claim, the same does not hold true for fraud claims. Fraud requires showing that Ford knew about and misrepresented some identifiable material fact and that it induced reliance on that misrepresentation in a way that ultimately harmed the plaintiff. *Small*, 65 P.3d at 1258. Unlike Song-Beverly, fraud claims require showing scienter, or specific intent. *Id.* As such, a plaintiff advancing under a fraud theory bears a higher burden than under Song-Beverly claims to identify the particular fact or facts that defendant is allegedly misrepresenting.

---

[1] In their complaint, Plaintiffs averred that Ford had deliberately slow-rolled repairs for this problem by ordering short-term fixes that would not fix the underlying problem, seeking to string owners along until the warranty period ended and Ford would no longer be responsible for funding repairs. However, Plaintiffs have not pointed to any evidence beyond the recall campaign itself to substantiate this claim. As discussed below, that evidence does not create a genuine dispute with regard to their fraud claims.

The second and more fundamental problem is that a truthful voluntary recall campaign simply cannot be the pillar upholding a fraud claim against the manufacturer. Voluntary recalls are, by their nature, published and freely available online. *See* Dkt. 28-2, at 1-2, 17-19. Moreover, Ford affirmatively notifies affected customers by mail whenever it conducts a recall service campaign. *Id.* Plaintiffs' citation to *Avila v. Ford Motor Co.*, 821 F. Supp. 3d 1113, is not to the contrary. There, the district court explained that a dealership is reliant on the manufacturer to share information about recalls, which it can then convey to customers. *Avila*, 821 F. Supp. 3d at 1121. Because there was no recall in that case, the court held that a jury could have found that Ford concealed material facts about an engine defect from customers. *Id.* Here, there was a recall, and the dealership knew about it, as evidenced by the fact that it conducted repair work as directed by the recall campaign two days before selling the car to Ms. Ruiz-Steele. Thus, to the extent Ford had a duty to disclose information about the potential defect, it met that duty by issuing the nationwide voluntary recall and notifying dealerships and affected customers. See Dkt. 28-2. Ms. Ruiz-Steele may have wanted more personal notice at the time of purchase, but Ford—the national manufacturer—could scarcely have done more. Plaintiffs dismissed their claims against Hansel Ford, the local dealer who sold the car, who would have been best positioned to inform purchasers about recent maintenance. Finally, Ford contends that it believed the recall service conduct in 2022 would fix any potential problems, meaning that there was no longer any material fact about an ongoing defect to conceal. Plaintiffs have not pointed to any evidence that Ford, at the time of sale, knew that further work would be required to address the potential risk of under-hood fires—let alone that it intended such repairs as a useless facade to placate customers, as averred in the complaint.

This theory thus fails at the first prong of the fraud analysis, because there is no evidence that Ford mispresented or concealed information about an engine defect.

*2. Battery-Related Claims*

Plaintiffs also argue that "the defect manifested in this vehicle," citing the issues they faced with the Maverick's 12-volt battery in 2024. As discussed *infra*, the attempt to link the engine fire

recalls to the battery problems is half-hearted and inadequate at best, as Plaintiffs offer no evidence causally connecting the two despite the full benefit of discovery. Even on its own, however, this battery defect theory fails as the basis for a fraud claim.

Here, the problem is again a lack of evidence of knowledge and misrepresentation of a material fact prior to the sale of the vehicle. Plaintiffs offer no evidence that the battery issue their car faced was a systemic one about which Ford knew or should have known, rather than an isolated defective part problem more suitably addressed through their Song-Beverly claims. Even crediting their declarations that the battery issues caused them harm in the form of inconvenience, anxiety, and incidental costs, fraud requires meeting all the other prongs as well. Plaintiffs simply have not established a genuine dispute that Ford knew about and concealed a battery problem with the Maverick. Thus, even if the battery problems constitute a "defect" for some purposes, they cannot sustain a fraud claim.

*3. The Battery Issues as a Symptom of an Engine Defect*

Plaintiffs argue briefly that this battery issue was in fact an "engine" problem, attempting to tie it back to the recall campaign and suggesting that both are tied to an underlying "defect" in the engine about which Ford must have known prior to selling Ms. Ruiz-Steele the car. Opp. at 10-11. However, the fact that the check-engine light came on or that the engine would not start does little to help Plaintiffs here, because the evidence indicates that the dealership repaired the issue by replacing the battery. Plaintiffs offer no evidence suggesting that the issues with failures to start the car persisted after September 2024. Conceivably, this is because Mr. Boek simply stopped driving it, but his distrust of the car is not itself evidence of an ongoing defect. Moreover, they fail to offer *any* evidence indicating or even suggesting that the battery issue may have been caused by a broader, underlying engine defect. Plaintiffs say that they need not pinpoint the mechanical cause of a vehicle's failure to perform under the Song-Beverly Act, but to prove fraud, they *do* need to demonstrate that Ford knew about, concealed, and misrepresented a material fact about the car. Again, Plaintiffs do not point to evidence in the record by which a reasonable fact-finder could conclude, even drawing inferences in their favor, that the defective battery was merely a

symptom rather than the cause of their frustrations with the Maverick. Ford has met its burden by pointing to Plaintiffs' lack of evidence.

Plaintiffs point to what they claim are flaws in Ford's evidence, but this attempt to create a dispute of fact is unavailing. First, Plaintiffs say Mr. Payne, a Ford engineer who submitted declarations on the company's behalf, omits and ignores the "single presentment most directly contradicting his conclusion," which is that the subject vehicle "never presented for any concern or complaint relating to the 2.5L engine." Dkt. 27 at 9-10. They argue that his "stated source" does not include the September 2024 repairs, and a "declaration whose sole stated foundation omits the very visit at issue cannot establish an undisputed fact." Contrary to Plaintiffs' assertions, Mr. Payne's report is not based *solely* on Ford's Standard Claims List and available repair orders; he explained his report is based on the complaint, as well as information on the subject vehicle "*including, but not limited to,* the warranties relating to the Subject Vehicle, Field Service Actions and Recalls performed, dealership repair orders, and Ford's Standard Claims List." Dkt. 24-18 at 1 (emphasis added). True, Mr. Payne's Exhibit 1 is simply the Standard Claims List. However, Ford submitted *all* relevant dealership repair orders as separate exhibits to its motion, including the September 2024 repairs Plaintiffs claim Mr. Payne ignored. Dkt. 24-10, 24-11. In his declaration, Mr. Payne specifically cited those exhibits. Dkt. 24-18 at 2-3. In short, Mr. Payne's declaration has foundation to, and in fact does, address the September 2024 service visit on which Ms. Ruiz-Steele now seeks to anchor her claims.

Even if the battery were a symptom of some broader engine defect, Plaintiffs offer no evidence to tie it to the *particular* defect about which they claim Ford knew: the recall campaign dealing with the accumulation of fuel vapors under the hood. At least for purposes of their fraud claim, this element is crucial. It is not enough that the car was defective, even accepting for the sake of argument that it was. For Plaintiffs to prevail, Ford must at minimum have made some misrepresentation that concealed a material fact about which Ford knew at the time of sale. There is insufficient evidence to create a genuine dispute of material fact on this point. As such, Ford is entitled to summary judgment on this claim.

B. <u>Defendant's Requests for Admission</u>

During discovery, Ford submitted several requests for admission. Ford now argues that Plaintiffs never responded to those requests, despite receiving a significant extension of the deadline to do so; the replies were due in May, but Ford stipulated to treat them as timely if returned by September 1. On that basis, Ford wants those points to be deemed admitted by Plaintiffs. In particular, Ford seeks admissions by default by Plaintiffs that (1) they never brought the vehicle to a Ford authorized repair facility for any complaint related to the engine; (2) they do not have any repair orders in which Ford diagnosed the subject vehicle with any engine defect; (3) they do not have any repair orders reflecting that the vehicle was brought in to an authorized repair facility for an engine defect; and (4) the vehicle was fit for ordinary purposes at the time of purchase.

For the instant motion, it is unnecessary to decide whether these facts are admitted. However, since they may be relevant in adjudicating Plaintiffs' remaining claims, the parties are ordered to submit additional briefing as to why these items should or should not be deemed admitted under Rule 36. Plaintiffs' initial arguments on this point are at best incomplete, because they erroneously assumed that they complied with Ford's stipulated deadline. However, Ford's reply brief and declarations indicate this is not the case, as counsel never received the Plaintiffs' response to their requests for admission.

## V. CONCLUSION

For the foregoing reasons, Defendant's motion for partial summary judgment as to the fraud claim is granted. Unless the parties reach a stipulation as to the requests for admission, the Plaintiffs are ordered to submit additional briefing as to the Rule 36 dispute within 30 days of this order, after which Defendant will have 14 days to submit any opposition.

**IT IS SO ORDERED**.

Dated: October 19, 2026



RICHARD SEEBORG
United States District Judge